*S. L. Johnson*, and *Barker*, for the appellees.

---

## The First Municipality of the City of New Orleans *v.* John McDonough.

Under the act of 8th March, 1836, dividing the city of New Orleans into three municipal corporations, each of the Municipalities is authorized to acquire, enjoy, alienate, mortgage, or otherwise dispose of all kinds of property, real, personal, or mixed; and such purchase may be for cash, or for a price payable at a future period.

A purchase of real estate by one of the Municipalities of the city of New Orleans, with a view to divide it into lots and streets and to re-sell the same, for the purpose of improving the cleanliness and salubrity of the city, and the convenience of the streets, is legal. Act 14 March, 1816.

Appeal from the District Court of the First District, *Buchanan*, J.

Garland, J. The petition sets forth that, in the month of February, 1837, the members composing the Council of the First Municipality, held a secret session, in which they adopted a resolution directing the Mayor and Committee of Improvement to purchase from the defendant, a large portion of the square of ground situated between Condé, Hospital, Barrack and Levee streets, for

a sum not exceeding $290,000, payable in the bonds of the Municipality, twenty-five years after date, bearing interest at the rate of six per cent per annum, payable semi-annually; but, if the purchase could not be effected on those terms, to conclude it by making the price payable in five annual instalments, with six per cent interest from date. This resolution was not approved by the Mayor, and the legal majority could not be found to pass it. At the meeting at which it was rejected, a resolution, similar in all respects, except as to the latter clause, was passed by the Council. This was also rejected by the Mayor, but upon a reconsideration after the veto, the resolution was passed by a legal majority of the Council.

In obedience to this last resolution, an authentic act was passed, on the 7th of April, 1837, by which the defendant sold the lot of ground in question to the plaintiffs for $247,000, payable in their bonds twenty-five years after date, with six per cent per annum interest, payable semi-annually.

The plaintiffs now pray that this contract may be annulled, that the bonds may be given up to be cancelled, the defendant condemned to repay $51,870 wrongfully paid for interest, and that the certificates for the interest may be also surrendered and cancelled, because, in the purchase of the property, and in issuing the bonds in question, the members of the Council acted contrary to law, and transcended the powers and authority delegated by the acts of incorporation. The petitioners allege, *first*, that when the Mayor had returned the first resolution with his veto, and the Council did not persist in it, they had no right, at the same sitting or meeting, to introduce or pass a similar resolution; *secondly*, that the purchase of the property was made with a view to a resale for profit, and for speculation, and not for the attainment of any of the objects in relation to which the Council was authorized to act; *thirdly*, that the Council had no power or authority to acquire the property; wherefore, the execution and delivery of the bonds and interest certificates are void and of no validity, and the deed of sale also null and void. The prayer of the petition is analogous to these various allegations, and the defendant has been enjoined from disposing of the bonds and certificates in any man-

ner, so as to put them beyond the reach of the process of the court.

For answer, the defendant admits the sale of the property for the consideration mentioned. He avers that it was made in good faith, at the instance and request of the corporation, for their sole and exclusive use; that the property has long since been delivered to the Municipality, and remains in their possession, except such portions as have been sold to other persons; that the plaintiffs have entirely changed the nature of the property, by pulling down and removing extensive and valuable buildings, by dividing the ground into small lots and selling them to various individuals, and by opening a street or streets through the same for public use and convenience. He states that the sale is legal and binding in all respects, and should not be rescinded for any of the causes stated; but if it should be annulled, he prays that the Municipality may be condemned to restore the property in the state in which it was when sold, and to pay all just and reasonable damages for the changes that have been made, and for all other injuries done to the same.

The resolutions of the Council, and the vetoes of the Mayor, are in the record, as well as the sale from the defendant duly accepted. Two hundred and forty-seven bonds, of $1000 each, were issued, and fifty interest certificates for each bond. The resolution shows that the Council were willing to give $290,000 for the property; but the consideration was $247,000, payable as stated. The Mayor, in his veto, informs the Council that the property was not worth more than half the sum proposed to be given for it; but their resolution was persisted in, and adopted with only two dissenting votes.

Gallien Preval, who was a member of the Council, and took an active part, as it appears, in this transaction, testifies that the object in purchasing the property was to re-sell it, and that it was so understood by the Council, the public, and the people generally; that he does not know that such purpose was known to the defendant, as nothing was ever said about it. A plan of the property was made after the purchase, and a street marked through the centre, and the lots sold, in conformity to the plan, to different

persons. He says that the Council was well aware, when the pur-
chase was made, that money would be lost by it; but that the ob-
ject in purchasing was to improve that part of the city. It was
the opinion of the members of the Council, at the time, that as
long as the property remained in the hands of the defendant, it
would not be improved ; and it was considered a nuisance so long
as it remained so. It was a detriment to other property in the
neighborhood, a receptacle for dirt and filth, and considered inju-
rious to the health of that part of the city. He says the Munici-
pality took possession, tore down every thing that was on the
ground, and caused to be sold at auction the immense brick build-
ing, formerly used as barracks by the United States. It was de-
molished, and the material in the foundation taken away by the
municipal authorities, and used in repairing the streets.

In February, 1839, and in June, 1840, a number of the lots
were sold at auction, by order of the Council, for upwards of
$70,000. That body, afterwards, not finding them so valuable
and useful as their predecessors had supposed they would be, got
all the sales annulled, released the purchasers, and in the month
of October, in the latter year, commenced this suit. When the
resolutions, directing the sale of the lots, were passed, they con-
tained a condition that the lots sold should be improved, and houses
built upon a plan annexed, and they were so sold ; and the evi-
dence of the plaintiffs shows, that if they had been so built on and
improved, it would have been a great advantage to the surround-
ing property, and a great improvement to that quarter of the
city.

Prieur, the Mayor of the city, says, that he did not consider
this ground more a nuisance than other open lots around it. He
stated fully to the Council, his views as to the inexpediency of the
purchase, yet they persisted. He says that the opening of the
street was a public convenience ; not a very great one, but calcu-
lated to give additional value to the lots offered for sale.

The District Court gave a judgment for the plaintiffs, annulling
the sale, decreeing a restoration of the bonds and interest certifi-
cates, and condemning the defendant to pay $51,870, which he
had received for interest on the bonds, from which he has ap-
pealed. The first ground upon which it is alleged that the resolu-

tion is null, depends entirely upon the rules adopted by the Council for its government. They are not in evidence; but if they were, they would not affect the case, as it appears that all rules were dispensed with when the resolution was adopted.

In the case of *The First Municipality of New Orleans* v. *The Orleans Theatre Company*, ante, 209, which is nearly similar to the present case, we very recently examined into the power and authority of the Council to purchase and sell real estate, by any description of title whatever. The language of the act of 1836, dividing the city into municipalities, is as express and general as can well be used. B. & C. Dig. 123, sec. 6. The Civil Code, art. 424, says, that all such corporations may hold real estate, and enjoy the same. Besides all the specific powers, there is a sweeping clause in the act of 1836, which says, that the Municipalities shall, each within its limits, possess and exercise all the powers, rights and privileges, which were at the time possessed and exercised by the corporation of New Orleans. It is well known, that that body acquired and sold large quantities of real estate. The Congress of the United States treated it as a corporation, capable of receiving and alienating landed property. 1 Land Laws, 549, 581, 598, 803, 835. And it is known that portions of the land, not necessary for municipal purposes, have been sold by that corporation and its successors, the present Municipalities. The titles of many lots in the city can easily be traced to the corporation, and there is no doubt many more will be sold by it as its want of pecuniary means shall make it necessary to sell. If this court were to exercise a controlling power over the faculty of the corporation to acquire real property, it might, with equal propriety, control its discretion to alienate; and thus a field for litigation would be opened, which we do not believe the legislature ever contemplated.

In this case the evidence shows, that the intention of the corporation was not to make money by speculating in real estate. It is true the intention to re-sell the property was known and avowed, but not for the purpose of making money; but to abate what the Council considered a nuisance, to improve that part of the city, destroy a receptacle for filth, preserve the health of the citizens, and open a street for public convenience, all legitimate objects on

the part of the Council. It is not for us to enter into the motives of the Council, and say that they were improper or impure, without any allegation or proof to that effect, however impolitic or inexpedient we may individually think the scheme.

If a want of authority to purchase the property in question existed, it is a little remarkable that it should not have been suggested by the Mayor, in either of his veto messages. He did all that he could, to convince the Council of the inexpediency of the purchase, but never suggested a doubt as to the power. He speaks of the value of the property; says too much is proposed to be given for it; that a loss of at least $140,000 will be the result of it; tells them that the means of the Municipality are not adequate to such an operation; and, being doubtless informed of the purposes which the Council had in view, says, that to fulfil the objects proposed, if he thought a loss of only $15,000 or $20,000 would result to the Municipality, he would not make an objection; as the deficit would be made up in the augmentation in value resulting to that quarter by the contemplated improvements, but that $140,000 is too much to give for such objects. It is thus seen that, if we depart a single step from the question whether the corporation has a right to buy and sell real estate, a proposition arises that we cannot grasp judicially, without undertaking to exercise a supervising control over all the proceedings of the Municipality, on questions of expediency.

We then come back to the question, has the Municipality power to purchase real estate? The legislature, in 1836, say, in broad terms, that it may acquire, by onerous or gratuitous title, all kinds of property, real, personal or mixed, and may enjoy, alienate, mortgage, or otherwise dispose of the same. What restriction or limitation is there on the Council? The counsel for the plaintiffs insist that the members can only exercise their functions according to art. 430 of the Code, which says that they shall not exceed the limits of the administration entrusted to them. This is very true, but the same article declares that the attorneys and officers of corporations have their duties pointed out by their nomination, and exercise them according to the general regulations and particular statutes of the corporation of which they are the heads; and, if the powers are not expressly determined, that they are re-

gulated in the same manner as other agents.   The counsel for the defendant, with the mandate in his hand, alleges that the members of the Council of the Municipality can buy and sell real estate. True,  say the  counsel for the plaintiffs,  but in this instance they have exceeded the limits of the  administration entrusted to them. The response is ready, that they have not done so, as the object of the purchase was " to maintain the cleanliness and salubrity of the city, and to secure the safety and convenience of  passing the streets and squares," purposes which are specially confided to them by the act of 1816.   B. & C. Dig.  101,  sec. 1.   We cannot, therefore, declare this contract void, without saying that the motives assigned for it are improper, and the objects intended mere pretences, neither of which are alleged or proved.

The counsel for the plaintiffs, and the Judge of the District Court, rely much upon the Council being restricted in the power of taxation.   The only restriction is, that taxes shall not be laid for purposes not contemplated by the acts of incorporation ; and this brings us back to the main question of power.   The other arguments of the judge and counsel resolve themselves into the same question.

The counsel for the plaintiffs say that it is not just, and that the corporation has no right to issue bonds that will bind posterity, or the people who may be alive in 1862.   If the corporation has a right to purchase real estate, there is no restriction as to whether it shall be for cash or on credit ; it may, therefore, lay taxes to pay debts incurred for property, and if it be of a  description that will benefit the future generation as much as the present, we see no serious objection to making those who succeed to the benefit bear a share of the burden.

If the power to purchase be established, the power to give the evidence necessary to secure the price necessarily ensues, and whether the credit be long or short is a matter of indifference. We see no force in the argument, that because the members of the Council are only elected for one year, no obligation, having more than one year to run, is legal.   The obligation is that of the corporation, which is perpetual ; the change of agents no way affects the question, otherwise the length to which the credit could be extended, would be shortened in proportion as the terms of

service of the members had elapsed and would finally be reduced to a single day.

It appearing to us well established by our own legislation, that civil corporations can acquire and possess real estate ; that, by the jurisprudence of our sister States, it is an incident to every corporation to have the capacity to purchase lands and chattels unless restricted, and that all have the absolute *jus disponendi*, neither limited as to objects, nor circumscribed as to quantity ; and it being further established that the agents of corporations stand very nearly, if not precisely, in the same situation as individual agents, we are compelled to believe the opinion of the first judge erroneous ; and it must be reversed. Civ. Code, art. 430. 2 Kent's Com. 227. Angel on Corporations, 104.

The judgment of the District Court is, therefore, reversed ; and ours is in favor of the defendant, with costs in both courts.

*Roselius* and *Preston*, for the plaintiffs.

*Grymes*, for the appellant.