Mr. Justice WAYNE
delivered the opinion of the court.
This is a libel in rem, to recover damages for injuries-arising from a collision, alleged to have happened within the ebb "and flow of the tide in the Mississippi river, about ninety-five miles above New Orleans.
The decree of the Circuit Court is resisted upon the merits, and also upon the ground that the case is not within the admiralty and maritime jurisdiction of the courts of the United States.
We will first consider the point of jurisdiction.
The learned counsel for the appellants, Mr. Reverdy Johnson, contended, that, even if the evidence proved that the collision took place within the ebb and flow of the tide, the court had not jurisdiction, because the locality is infra corpus comitatus.
Two grounds were taken to maintain that position.
1. Tha^ ^ grant in the constitution of “ all cases of admiralty and maritime jurisdiction ” was limited to what were cases of *452 admiralty and maritime jurisdiction in England when our Revolutionary war began, or when the constitution was adopted,, and that a collision between ships within the ebb and flow of the,tide, infra corpus comitatus, was not one of them.
2. That the distinguishing limitation of admiralty jurisdiction, and decisive test against it in England and in the United- States, except in the cases allowed in England,, was the competency of'a court'of common law to give a remedy in a given case in a trial by jury. And as auxiliary to this ground it was urged, that the clause in the ninth section of the Judiciary Act of‘1789 (1 Statutes at Largé, 77), “ saying to suitors in all cases the right of a common law remedy, where the- common law is competeht to give it,” took away such cases from the admiralty jurisdiction of the courts of the United States.
The same positions, have béen taken again by Mr. Jlmes and Mr. Whipple, in tbe case of the5 New Jersey Steam Navigation Company v. The Merchants’ Bank of Boston. Every thing in support of them, which-could be drawn from the history of admiralty jurisdiction1 in England, or from what had been its practice in. the United States, and from' adjudged cases in noth countries, was urged by those gentlemen.' All . must admit, who heard them', that nothing,was omitted which could be brought to bear Upon the subject. We come, then, to the decision of these points, with every advantage which learned research, and ingenious and comprehensive deduction from it, can give us.
It is. the first time that the point has been distinctly presented to this court, whether a case of collision in our rivers, where the tide ebbs and flows, is within the ¿dmiralty jurisdiction of the courts of the. United States, if the locality be, in the sense in-which it is used by the common law judges, in England, infra corpus comita-tus. It is this point that we are now about to decide, and it is our wish that nothing which may be said in the course of our remarks shall be extended to embrace any other, case of contested admiralty jurisdiction. .
W.e do not think that either of the grounds taken can be maintained. But before giving our reasons for this conclusion, it will ue well for us to state the cases in which the instance court- in England exercised jurisdiction when our constitution was adopted.
In casés to enforce judgments of foreign admiralty courts, when the person or his goods are within the jurisdiction. Mariners’ wages, except when the contract was under seal, or made out pi the customary way- of such contracts. Bottomry, in certain cases .only, and under many restrictions.' Salvage, when 'he property shipwrecked was not cast ashore. Cases between the several owrfers of ships, when they disputed among themselves about the policy or advantage. of sending her upon a particular voyage. In cases of goods, and .the11 proceeds of goods piratically taken, which will be arrested by a *453 warrant from the court, as belonging to the crowd arid as droits of the admiralty. And in cases of collision, and- injuries to property or persons on the high seas.
It may as well be said by us, at once, that, in cases of this last class, it'has frequently been adjudicated in the English common law courts, since the restraining statutes of Richard ,11. and Henry IV. were passed, that high seas mean that portion of the sea which washes 'the open coast; and that any branch of the sea within the fauces terra, where a man may reasonably discern ■ ¿rom shore to shore-, is, or at least may be, within the body of a county . In fact, the. general rule in England has been, since the time of Lord Coke, upon the interpretation given by, the coarte of common law to the statutes 13 and 15 Richard II. and 2 Henry ÍV., to prohibit the admiralty from exercising jurisdiction in civil cases, or causes of action arising infra corpus comitatus. So sternly has the admiralty been excluded from what we believe to have been its ancient jurisdiction in England, that a prohibition within a few years has been issued-in a case of collision happening between the Isle of Wight and the Hampshire coast; and a case of collision in the river Humber, twenty.miles from the main sea, but within the flux and reflux of the tide,, has been held, not to be within the admiralty jurisdiction. The Public Opinion, 2 Hagg.. $98.
. It has not, however, been the undisputed rule, nor allowed .to be the correct interpretation' of the statutes) of Richard. It has always been contended by the advocates of the admiralty, that ports, creeks, and rivers are within its jurisdiction, and not within those statutes ; meaning that the ancient jurisdiction in such localities was not excluded by the words of the statutes. Browne,' however, -in his Civil and Admiralty Law, vql. 2, p. 92, thinks they werfe. within the -words of the statutes ; not meaning, though, to affirm the declaration of Lord Coke, that those statutes were affirmative of the common law. W e think they were not. However much every true English, and American lawyer may feel himself indebted to the-learning of that great lawyer, and will ever be cautious ¡of disparaging.it, it is difficult for any -one to read and reflect upon the part which he took in the controversy upon admiralty jurisdiction in England, without assenting to Mr. Justice Bullet’s remarks, in Smart v. Wolf, 3 Durn. & East, 348 : — “ With respect to what is said relative to the admiralty jurisdiction in 4th Inst. 135 I think that part of Lord Coke’s Work, has always been received with great caútioft, and frequently contradicted. He seems to have, entertained not only a jealousy of, but-an enmity against, that jurisdiction. The passage in 4th Jnst. 135, disallowing the right to take stipulations,' is expressly denied in 2 Lord Raym. 1826. And I may conclude with the words of Lord Holt in that case, that- in this case.£ the admiralty had jurisdiction,, and there is neither statute nor common law.to restrain utem.’”
*454 Having thus admitted, to the fullest extent, the locality in England within which the courts of common law permitted the admiralty to exercise jurisdiction in cases of collision, we return to the ground taken, that the same limitation-is to be imposed, in like cases, upon the admiralty courts of the United States.
We have already said it cannot be maintained. It is opposed by general, and also by constitutional considerations, to which we have not heard an answer.
In the first place, those who framed the constitution, and the lawyers in America in that day, were familiar with a different and more extensive jurisdiction in most of the States when they were colonies, than was allowed in England, from the interpretation which was given by the common law courts to the restraining statutes of Richard II. and Henry IV. The commissions to the vice-admirals ip the colonies in North America, insular and continental, contained a, much larger jurisdiction than existed in England when they were granted. That to the governor of New Hampshire, investing him with the power of an admiralty judge, declares the jurisdiction to extend “ throughout all and every the sea-shores, public streams, ports, fresh-water rivers, creeks and arms, as well of the sea as of the rivers and coasts whatsoever, of our said provinces.”
In a work by Anthony Stokes, his Majesty’s chief justice in Georgia, entitled, “.A View of the Constitution of the British Colonies in North America and the West Indies,” will be found, at page 166, the form of the commission of vice-admiral for the provinces in North America. He says, in page 150, the dates in the commission are arbitrary,' and the name of any particular province is omitted. Its language is, — “ And we do hereby remit and grant unto you, the aforesaid A. B., our power and authority in and throughout our province of-afore mentioned, &c. &c., and maritime ports whatsoever, of the same and thereto adjacent, and also throughout all and .every of the sea-shores, public streams, ports, fresh-water rivers, creeks and arms, as well of the sea as of the rivers and coasts whatsoever, of our said province of F.” The extracts from both commissions are- the same. We have the authority of Chief Justice Stokes, that all given in the colonies were alike. The jurisdiction given in those commissions is as large as was exercised in the ancient practice in admiralty in England. It should be observed, too, that they were given long before any difficulties occurred between the mother country and ourselves ; and that they contained no power complained of by us afterwards, when it was said an attempt was made to extend admiralty powers “ beyond these ancient limits.” The king’s authority to grant those commissions in the colonies has never been, and cannot be, denied. In all' the appeals taken from the colonial courts to the High Court of Admiralty in England, no such thing was ever intimated.
Was it not known, also, that, whilst the States were colonies, vice- *455 admiralty courts had been in all of them, — in some, as has just been said, by commissions from the crown, with additional powers conferred upon them by acts of Parliament; in others, by rights reserved in their charters, and in other colonies by their own legislation ? — that, whether from either source, they exercised a jurisdic-' tion oyer all maritime contracts, and over torts and injuries, as well in ports as upon the high seas ? — that acts of Parliament recognized their jurisdiction .as original maritime jurisdiction, in all seizures for contravention of the revenue laws ?
Was not a larger jurisdiction in admiralty exercised in Massachusetts, throughout her whole colonial existence, than was permitted to the admiralty in England by the prohibitions of her common law courts ? Were her members in the convention which formed our constitution ignorant of it ?
Were the members from Pennsylvania and South Carolina forgetful, that the extent of the admiralty jurisdiction in the colonies had been the subject of, judicial inquiry in England, growing out of proceedings in the admiralty courts of both of those States in revenue cases ? — that it had been decided in 1754, in the case of the Vrow Dorothea, 2 Rob. 246, — which was an appeal from the vice-admiralty judge in South Carolina to the High Court of Admiralty, and thence to the delegates, — that the jurisdiction in admiralty in the colonies for a breach of the revenue laws was in its nature maritime, and was not a jurisdiction specially conferred by the statute of William III., ch. 2x' § 6 ; a judgment which subsequently received the assent of all the common law judges., in a reference to them from the privy council ? 2 Rob. 246 ; 8 Wheat. 397, note. This, too, after an eminent lawyer, Mr. West, assigned as counsel to the Commissioners of Trade and Plantatiqns, had in 1720 expressed the opinion, that the statutes of 13 and 15 Richard II., ch. 3, and .2 Henry IV., ch. 11, and 27 Elizabeth, ch. 11, were npt intro-ductivo of new laws, but only declarative of the common law,, and were therefore of force in the plantations ; and that none of the acts of trade and navigation gave the admiralty judges in the West Indies increase of jurisdiction beyond that exercised by the High Court of Admiralty at' home.
Shall it be presumed, also, that the members of the convention were altogether disregardful of what had been the early legislation of several of the States, when they were colonies, upon admiralty jurisdiction and the rples for proceeding in such courts ? — of the larger jurisdiction given by Virginia by her act of 1660, than was at that time allowed to the admiralty in England ? — 'that it was passed in the year that the ordinance of the republican government in England expired by the restoration ? That ordinance revived much of the ancient jurisdiction in admiralty. It was judicially acted upon in England for twelve years. When it expired there, the enlightened influences connected with trade and foreign commerce, “ and *456 the uncertainty of jurisdiction in the trial of maritime causes,” which led to its enactment, no doubt had their weight in inducing Virginia, then our leading colony in commerce, to adopt by legislation many of its provisions. That ordinance and the act of Virginia have, in our view, important bearings upon the point under consideration. They were well known to those who represented Virginia in the convention. . In its proceedings, they had an active and intellectual agency, which makes it very unlikely that they were unmindful of the admiralty jurisdiction in Virginia. In New York, also, there was a court of admiralty, the proceedings of which were according to the course' of the civil law. Maryland, too, had her admiralty, differing in jurisdiction from that of England.
Further, the proceedings of our Continental Congress in 1774 afford^reasons for us to conclude that no such limitation was meant. The admiralty jurisdiction, ancient and circumscribed as it after-wards was in England, and as it was exercised in the colonies, was necessarily the subject of examination, when the Congress was preparing the declaration and resolves - of. the 14th October, 1774 ; in which it is said, “ that the several acts of 4 George III., ch. 15, 34 ; 5 Geo. III.-, ch. 25 ; 6 Geo. III., ch. 52 ; 7 Geo. TIL, ch. 41 ; and 8 Geo, III., ch. 22, which impose duties for the purpose of raising a revenue in America, extend the power of the admiralty courts beyond their ancient limits.” Journal of Congress, 1774, 21. Again, when it was said (Journal, 33), after reciting other grievances under the statute of Í767, —* “ And amidst the just fears and jealousies thereby occasioned, a statute was made in the next year (1768) to establish courts of admiralty on a new model, expressly for the end of more effectually recovering of the penalties and forfeitures inflicted by, acts of -Parliament, framed for the purpose of raising revenue in America.” And again, in the address to the king (Journal, 47), it is said, — “ By several acts of Parliament, made in the fourth, fifth, sixth, seventh, and. eighth years of your Majesty’s reign, duties are imposed upon us for the purpose of raising a revenue, and the powers of the admiralty and vice-admiralty courts are extended beyond their ancient limits ; whereby our property is taken from us without our consent,” &c. Why this repeated allusion to the ancient limits of admiralty jurisdiction, by men fully acquainted with every part of English jurisprudence, -if ¡.hey had not believed it had existed in England at one time much beyond what was at that time its exercise' in her admiralty eourts ?
With these proceedings of the Continental Congress every member of the convention which framed the constitution was familiar. They knew, also, what had been,:the extent and the manner of the exercise of admiralty jurisdiction in the States, after the war began, until the articles of confederation had been ratifiéd, — what it had been thence to the adoption of the constitution. Advised, as they were by personal experience, of the difficulties which attended the *457 separate exercise by the States of admiralty powers, before the confederation was formed, and afterwards.from the restricted grant of judicial power in its articles, can it be supposed, in framing the constitution, when they were endeavouring to apply a remedy for those evils by getting the States to yield admiralty jurisdiction altogether to the United States, it was intended to circumscribe the larger jurisdiction existing in them to the limited cases, and those only then allowed in England to be cases of admiralty and maritime jurisdiction ? — that the latter was exclusively intended, without any reference to the former, with which they were most familiar ? Can it be reasonable to infer that such were the intentions of the framers of the constitution ? Is it not more reasonable to say, — nay, may we not sáy it is certain, — that, in their discussions and thoughts upon the grant of admiralty jurisdiction, they mingled with what they knew were cases of admiralty jurisdiction in England what it actually was and had been in the States they were representing, with an enlarged comprehension of the controversy which had been carried on in England for more than two hundred years, between the judges of the common law courts and the admiralty, upon the subject of its jurisdiction ? Besides, nothing can be found in the debates of the convention, nor in its' proceedings, nor in the debates of the conventions in the States upon the constitution, to sanction such an idea. It is remarkable, too, that the words, “ all cases of admiralty and maritime jurisdiction,” as they now are in the constitution, were in the first plan of government submitted to the convention^ and that in all subsequent proceedings and reports they were never changed. There was but one opinion concerning the grant, and that was, the necessity' to give a power to the United States to relieve them from the difficulties which had arisen from the exercise of admiralty jurisdiction by the States separately. That would not have been accomplished, if it had been intended to limit the power to the few cases of which the English courts took cognizance.
But, besides what we have already said, there is, in our opinion, an unanswerable constitutional objection to the limitation of “ all cases of admiralty and maritime jurisdiction,” as it is expressed in the constitution, to the cases of admiralty and maritime jurisdiction in England when our constitution was adopted. To do so would make the latter a part and parcel -of the constitution, — as much so as if those cases were written upon its face. It would take away from the courts of'the United States the interpretation of what were eases of admiralty and maritime jurisdiction. It would be a denial to Congress of all legislation upon the subject. It would make, for all time to come, without an amendment of the constitution, that unalterable by any legislation of ours, which can at any time be changed by the Parliament of England, — a limitation which never could have been meant, and cannot he inferred from the words, which extend the jurisdiction of the courts of the United States u to all *458 cases of admiralty and maritime jurisdiction.” One extension of the jurisdiction of the courts of the United States exists beyond the limitation proposed, just as it existed in the colonies before they became independent States, which never has been a case of admiralty jurisdiction in Englánd. We mean seizures under the laws of impost, navigation, or. trade of the United States, where the seizures are made on waters navigable from the sea by vessels, of ten or more tons burden, within the respective districts of the courts, as well as upon the high seas. And this, we have shown in a previous part of this opinion, was decided in England as early as 1754, with the subsequent assent of the common law judges, not to be a jurisdiction conferred upon the courts of admiralty in the colonies by statutes, but was a case in the colonies of admiralty jurisdiction (2 Rob. 246). And so' it is treated in .'the ninth section of the Judiciáry Act of 1789. We cannot help thinking that section — a declaration by Congress contemporary with the.adoption of the constitution — very decisive againstÁhe limitation contended for by counsel in this case. Again, this.court decided, as early as 1805 (2 Cranch, 405), in the case of the Sally, that the forfeiture of a vessel, under the act of Congress against the slave-trade, was a case of admiralty-and maritime jurisdiction, and_not of common law. And so it had done before, in the case of the La Vengeance (3 Dali. 397). Again, Congress, by an act passed the 19th of June, 1813 (3 Stat. :at Large, 2), declared that a vessel employed in a fishing voyage should be answerable for the fishermen’s share of the fish caught, upon-a contract made on land, in the same form and to the same effect as any other vessel is by law liable to be proceeded against for the wages of seamen or mariners in. the merchant service. We shall cite no more, though we might do so, of legislative and judicial interpretations, to show that the admiralty jurisdiction of the courts of the United States is not.confined to the cases of -admiralty jurisdiction in England when the constitution was adopted.
No such interpretation has been permitted in respect to any other power in the constitution. In what aspect would it not.'be presented, if applied to the clause immediately preceding the grant of admiralty jurisdiction, — “ to all cases affecting ambassadors, other ministers, and .consuls ” ? Is that grant, too, to be' interpreted by the jurisdiction which the English common law courts exercise in cases affecting those functionaries, or to be,regulated - by what Lord Coke says, in 4 Inst. 152, to be their liabilities to punishment for offences ? Try the interpretation proposed by its application to the grant to Congress “ to establish uniform laws on the subject of bankruptcies throughout the United States.” Would it not result in this, that all the power which Congress had under that grant was the bankrupt system of‘England as it existed there when the constitution was adopted ? Such a limitation upon that clause we deny. We think we may very safely say, such interpretations of *459 any grant in the constitution, or limitations upon those grants, according to any English legislation or judicial hile, cannot be permitted. At- most, they furnish only analogies to aid us in oiir constitutional expositions. We therefore conclude, that the grant of admiralty power to the courts df the United States was not intended to be limitéd or to be interpreted by what were cases of admiralty jurisdiction in England when the constitution was adopted.
We will now consider the proposition, that the test against admiralty jurisdiction in England and the United States is the competency of a court of common law to give a remedy in a given case in a trial by jury ;• or that in all cases, except in seamen’s wages, where the courts of common law have a concurrent jurisdiction with the admiralty, and can try the cause and give redress, that alone takes away the admiralty jurisdiction. It has the authority of Lord Coke to sustain it. But it was the effort and the design of Lord Coke to make locality the boundary in cases of contract, as well as in tort, that is, to limit the jurisdiction in .admiralty to- contracts made on the sea and to be executed on the sea ; and to exclude its jurisdiction in all cases of marine contracts made on the land, though they related exclusively to marine services, principally to be executed on the sea. To that extent the admiralty courts were prohibited by the common law judges from exercising jurisdiction,, until the unreasonableness and inconvenience of the restriction forced them to relax it in the case of seamen’s wages. " Then it was that the common law courts began to reflect upon what, jurisdiction in admiralty rested, and upon the principles upon which it would attach. With the acknowledgment of all of them ever since, it was affirmed that the subject-matter, and not locality, determined the jurisdiction in cases of contract. Passing over intermediate decisions showing the manner and the reasons given for '.the relaxation in the one case, and the revival of the other, for which the admiralty always contended, we will cite the case of Menetone v. Gibbons, 3 Durn. & East, 269, 270. Lord Kenyon and Sir Francis Buller say, in that case, the.question whether the admiralty has or has not jurisdiction depends upon the subject-matter. We wish it to be remarked, however, that the manner of proceeding is another affair, with which we do not meddle now.
It was only upon the principle that the subject-matter in cases of contract determined- the jurisdiction, that this court decided the cases of The Aurora, 1 Wheat. 96, The General Smith, 4 Wheat. 438, and The St. Jago de Cuba, 9 Wheat. 409.
If, then, in both classes of civil cases of which the instance court has jurisdiction, subject-matter' in the-one'class, and locality in the other, ascertains it, neither-a jury trial nor the concurrent 'jurisdiction of the common law courts can be a test for jurisdiction in either class. Crimes, as well those of which the admiralty has jurisdiction as those of which it has not, except- in cases of impeachment, the *460 constitution declares shall be tried by .a jury. But diere is no provision, as tbe; constitution, originally was, from which it can be. inferred that civil. causes in admiralty were to be tried by. a jury, contrary to-what:the framers of the constitution knew was the. mode of trial of issues of fact in the admiralty. We confess, then, we cannot see how they are to be embraced in the seventh amendment of the. constitution, providing that in suits at common law the trial by juiy should be preserved. Cases under twenty dollars are not so provided for'. Does not the specification of amount show the class of' suits meant in the amendment, if any thing could show it more .conclusively than the term “ suits at common law ” ?.
Suits at- common law are a distinct class, so recognized in the constitution, whether they be such as are concurrent with .suits of which there is jurisdiction in admiralty, or not. Can concurrent' jurisdiction imply exclusion of jurisdiction from .tribunals, in cases admitted to have been cases in admiralty, without trial by jury ? Again, suits at common law indicate a class, to distinguish them from suits in equity and admiralty ; cases in admiralty, another class distinguishable from both, as well, as to the system.of. laws determining them as the manner of trial,, except that in equity issues of fact may be sent to the common law courts for á trial 'by-juryi Suppose, then,-the seventh amendment of the constitution had. .not been made, suits at the common law and in admiralty would have been tried in the accustomed way of each. But an amendment is made, inhibiting ány law from being passed which shall take away the right of trial by jury in suits at common law. Now by what rule of interpretation or by what course of reasoning can such a, provision be converted -into an inhibition upon the mode of trial of. suits which are not exclusively suits at common law, recognized, too, as such by the constitution, for'the trial of which Congress can establish courts which are not courts of common law, but courts of admiralty, without or with a jury, in its discretion, to try all issues of.fact ? Tried in.either way., {hough, they are still cases in admiralty, and this power; in Congress,' under the grant of admiralty jurisdiction, to try issues of fact in it by. jury, being as wéll known when the seventh amendment ■was made as 'it is now, is conclusive that it was done with reference to suits at common law alone. There is no escape from this result, unless, it is to be.- implied that the amendments were proposed by persons careless or ignorant of the difference in the mode of trial of suits,, at common law and in admiralty. But they were not so, for we find some of them in Congress, a few months after, preparing and concurring in the enactment-of a. law, that the “ trials of issues in fact, in the District Courts, in all causes except civil causes of, admiralty and maritime jurisdiction, shall be by juryi”
. In respect to the-clause in the ninth section of the. Judiciary" Act, — “saving and reserving to-suitors in all cases a common law remedy where the comm'on law is competent to give it,” —we *461 remark, its meaning is, that .in cás'es of concurrent jurisdiction, in-admiralty and common, law, the jurisdiction in the latter is not taken away. The saving is for the benefit of suitors, plaintiff and defendant, when the plaintiff in a case of concurrent jurisdiction chooses to sue in the common law courts, so giving to himself and the defendant all the advantages which such tribunals can give, to suitors in them. It certainly could not have been intended moré , for the benefit of the defendant than for the plaintiff, which would-be the case if he could at his will force the plaintiff into a co.mmon law court, and in'thatway release himself and his'property from all. the responsibilities which , a court of admiralty can impose upon both, as a security and indemnity for injuries of which a libellant máy complain, — securities which a- court of common law cannot give.
Having disposed of the objections to the jurisdiction of . the courts of ádmiralty of . the United States, growing out of the supposed limitation of them to the cases allowed in England'and from the- test of jury trial, we proceed to consider thát objection to juris diction in this case, because the collision took place infra corpus comitatus. ■ We have admitted the validity of this objection in England, but on the other hand it cannot be deñiecCíhat the restriction there to cases of collision happening super alturn mare, of without the fauces terree, was imposed -by the statutes of Richard, contrary to what had been in England the ancient exercise of admiralty jurisdiction in ports and hávefts within the ebb and flow of the' tide. Wé have .seen no case, ancient or modern, from which it can .correctly be inferred,''that such exercise of jurisdiction was prohibited by mere force of the common law. The most that can be said in favor of the statutes ófiRichárd being affirmative of the common law, are- the assertions of Lord' Coke and the prohibitions of the common, law courts, subsequent to.thpse statutes, and foundéd upon them, restricting the jurisdiction of the courts of admiralty to cases of collisions happening upon the high- seas ; contrary to what, we have already said was its ancient jurisdiction in ports and havens in. cases -of torts and collision, and certainly in opposition to what was then, and still continues to be, the admiralty jurisdiction, in cases of collision, of every other .country in Europe.
But giving to such prohibitions of the courts of common daw thé utmost authority claimed for them,— that is, that they áre af-firmances of the common law as interpretations of the statutes, of Richard, •— does it follow- that they- are to be taken as a rule in -the ¿.dmiraity courts o£, the United States in cases of collision ? Must, it not first be'shown that the statutes of Richard were in force áá such in America, and that the colonies considered and adopted that portion of the common law as applicable to their situation ? Now, the statutes of Richard were never in force in any of the colonies, except ás;.they were adopted by the legislation of some of them ; and the common law only in its general .principles, as' they were ap- ' *462 plicable, with such portions of it as were adopted by common consent in any one of the colonies, or by statute. . This being ■ so, the rule in England for collision cases' being neither obligatory here by the statutes of Richard .nor by the common law, we feel ourselves permitted tp look beyond them, to ascertain what the locality is which gives jurisdiction to the courts of the' United States in cases of collision or tort, or what makes the subject-matter of any service or undertaking a marine contract. Are we bound to say, because it has been so said by the common law courts in England' in reference to the point under discussion, that sea always means high sea, or the main sea ? — that the waters flowing from it into havens, ports, and rivers are not “parcel of the sea” ? — that the fact of the political division of a country into counties makes it otherwise, and takes away the jurisdiction in admiralty, in respect to albthe marine means of commerce and the injuries which may be done to vessels in their passage from the sea to their ports of. destination, and in their outward-bound voyages until they are upon the high sed ? Is there not a surer foundation for a correct ascertainment of the'' locality of marine jurisdiction in the general admiralty law, than the designation of it-by the common.law courts in England t Especially when the latter has in no instance been applied by England as a limitation upon the general admiralty law in any of her colonies ; and when in all of them, until the act of-2 William IV., c. 51, was passed, the commissions gave to hervice-admirals jurisdiction “ throughout till and every of the sea-shores, public streams, ports, fresh-water rivers., creeks and arms, as well of the sea as of the rivers and coasts whatsoever.” Besides, the use of the word sea to fix admiralty jurisdiction, and what part of it might be within' the body of a county, have not been settled points among the common law judges in England. Lord Hale differed from Lord Coke. THe former, in defining what the sea is, says, — “ that it is either, that' which lies within the body of the county or without; that-arm or branch of the sea which lies within the fauces terree is, or at least may-be,-within the-body of a county ; that part which lies not within the body of a county is called die main sea.?’ It is difficult tó reconcile the difference's of opinion and of definition'given by the common law Courts in Lord Coke’s day, and for fifty years afterwards, as to the meaning and legal application of the word sea, , so-.as to'make, a practical rule to govern the decisions of cases,, or to determine what were cases of admiralty jurisdiction. But there. is, no difficulty in making such a rule,- if the construction of it, by the admiralty, courts, is adopted. In that construction, it meant-riot only high sea, but arms of the sea, waters fldwing'firom it into ports and havens, and as high upon rivers as.the tide ebbs and flows. We think in the controversy between the courts of admiralty and common law, upon the subject of jurisdiction, that the -former have the best .of -the argument j that they *463 maintain the jurisdiction for which they contend with more learning* more directness of purpose, and w.ithout any of that verbal subtilty which is found in the arguments of -their adversaries. The conclusions of the admiralty, too, are more congenial with our geographical condition. We may very reasonably infer they were thought so on .that account by the framers of the constitution when the judicial grant "was expressed by them in the words, — “all cases of admiralty and maritime jurisdiction.” In those words it is. given by Congress to the courts, leaving to them the interpretation of what were such cases; as well the subject-matter which makes' them so, as the locality which gives admiralty jurisdiction in cases of tort and collision. The grant, too, has been interpreted by this court in some cases of the first class, which leaves no doubt upon our minds as to the locality which gives jurisdiction ■ in the other. We do not consider it an open question, but res adjudicóla by this court. In Peyroux et al. v. Howard & Varion, 7 Pet. 342, the objection to the jurisdiction was overruled, upon the ground that the subject-matter of the service rendered was maritime, and performed within the ebb and flow of .the tide, at New Orleans. The court say, although the current in the Mississippi at New Orleans may be so strong as not to be turned backward by the tide, yet if the efFect of the tide upon the current is so great ás to occasion a regular rise and fall of the water, it may. properly be said to be within the ebb and flow of the tide. The material consideration is, whether .the service is essentially a maritime service and to be performed on the sea or on tide water. In the case of The Steamboat Orleans v. Phœbus, 11 Peters, 175, the jurisdiction of the court was denied, on the ground that the boat was not employed or intended to be employed in navigation and trade on the sea, or on tide waters. In Steamboat Jefferson, Johnson claimant, 10 Wheat. 428, this court says, — “ In respect to contracts for the ! ire of seamen, the admiralty never pretended to claim, nor could it rightfully exercise, any jurisdiction, "except in cases where the service" was substantially performed, or to be performed, an the sea or upon waters vrithin the ehb and flow of the tide. This is the prescribed limit, which it was not at liberty to transcend. We say, the service was to be substantially performed on the sea, or on tide water, because there is no doubt that the jurisdiction exists, although the commencement or termination of the voyage may happen to be at some place.beyond the reach of the tide. The material consideration, is, whether the service is essentially a maritime service. In. the.present case the voyage, not only in its commencement and termination, but in" all its intermediate progress, was several hundred miles above the ebb and Jiote of the tide; and in no just sense can the wages be considered as earned in a maritime employment.” In United States v. Coombs, 12 Pet. 72, where the question certified to the court directly involved what was *464 the admiralty jurisdiction, under the grant of “ all cases of admiralty and maritime jurisdiction,” the language'of this courtis,— “ The question which arises is, What is the true nature and extent of the admiralty jurisdiction ? Does' it, in cases where it is dependent upon locality, reach beyond high-water mark ? Our opinion is, that in cases purely dependent upon the locality of the act done, it is limited to the sea, and to tide waters, as far as the' tide flows ; and that it does not reach beyond high-water mark. It is the doctrine which has been repeatedly asserted by this court; and we see no reason to depart from it.” Now, though none 'of the foregoing cases are. cases of collision upon tide waters, biit of contracts, services rendered essentially maritime, and in a case of wreck, — the point ruled in all of them, as to the jurisdiction of the court in tide water as far as the tide flows, was directly presented for decision in each of them. The locality of jurisdiction, then, having been ascertained, it must comprehend cases of collision happening in it. Our conclusion is, that the admiralty jurisdiction of the-courts of the United States extends to tide waters, as far as the tide flows, though that may be infra corpus comitatm ; that the case before us did happen where the tide ebbed and flowed infra corpus comitatus,-and that the court has jurisdiction to decree upon the claim of the libellant for damages.
Before leaving this point, however, we desire to say that the ninth section of the Judiciary Act countenances all the conclusions which have been announced in this opinion. ■ We look upon it as legislative action contemporary with the first being, of the constitution, expressive of the opinion of some of its framers, that the grant of admiralty jurisdiction was to be interpreted by the courts in accordance with the acknowledged principles of . general admiralty law. In that section the distinction is made betweén high seas and waters which are navigable from the sea by vessels of ten or more tons burden. Admiralty jurisdiction is given upon both, and though the latter is confined by the .language to cases of seizure, it is so with the understanding that such cases were strictly of themselves within the admiralty jurisdiction. It declares that issues of fact' in civil causes of admiralty and maritime jurisdiction shall not be tried by a jury, and makes so. clear an assignment to the courts of jurisdiction in criminal, admiralty, and common law suits, that the two last cannot be,so confounded as to place both of them under the seventh amendrtjent of the constitution, which is, — “In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined, in any court of the United States, than according to the rules of the common law.”
As to the merits of this case, as they, are .disclosed by the evidence, we think that the Luda was run down, whilst she was in the accustomed channel of upward navigation, by the De Soto, being *465 out of that for which she' should have been steered to make the port to. which she was bound. It is a fault which makes -the defendants answerable for the losses sustained from the collision. .That loss will not be more than compensated by the decree of the Circuit Court. We shall direct the decree to be affirmed'.
There is'a point in this' case still untouched by us, which we will now decide., The libellants claim a recovery, independently of all the other evidence in the case, upon the single fact disclosed by it, that the collision happened whilst the De Soto was navigating the river at night without' such signal lights as are required by the tenth section of the act ctf the 7th of July, 1838 (5 Stat. at Large, 304). It is entitled, “An act to provide for the better security of the lives of passengers on board of vessels propelled in whole or part .by steam.” The tenth section of it declares,— “ It shall be the duty of the master and owner of every steamboat, running between sunset and sunrise, to carry one or more signal lights, that may be seen by other boats navigating the same waters, under the penalty of two hundred dollars.” This section, and the other provisions of the act, except as jt has been changed by the act of 1843 (5 Stat. at Large, 626), apply to all steamers, whatever waters they may bd navigated upon, within the United States or upon the coast of the same, between any of its ports. Signal lights at night áre a proper precaution conducing to the safety of persons and property.. The neglect of it, or of any other requirement of the statute, subjects the masters and owners of steamboats to a penalty of two hundred dollars, which maybe recovered by suit or indictment {§ 11). But, besides the penalty, if such neglect or disobedience of the law shall be proved to exist when injury shall occur to persons or property, it would throw upon the master and owner of a steamboat by whom the law has been disregarded the burden of proof,- to show that the injury done was not the consequence of it.
It is said, in this case, that the De Soto had not signal lights. -Whether this be so or not, we do not determine ; but it. is certain, from some cause or other, that they were not seen by those navigating the Luda. If they had been, it is not improbable that the collision would have been avoided. - We do not put our decision of this case, however, upon this ground, but we do say, if a collision occurs between steamers at night, and one of them has not signal lights, she will be held responsible for all losses until it is proved that the' collision was not the consequence of it.
The act of, July 7th, 1838, in all its provisions, is obligatory upon the owners and masters of steamers navigating the waters of the United States,.whether navigating on waters within a State ox between States, or waters running from one State into another State, or on the coast of the United States between the ports of the same State or different States.
*466 Mr. Justice CATRON.
The question here is, how far the judicial powers of the District Courts extend in cases of admiralty and • maritime jurisdiction, as conférred by the constitution. With cases of prize, and cases growing out of the revenue laws, we' have no concern at present. • These depend on the general power conferred on the judiciary to‘ try all cases arising under the laws of the United States. It is-only with the extent of powers possessed by the District Courts, acting as instance courts of admiralty, we are dealing. The act of 17S8' gives the entire constitutional power to determine “all civil caifses of admiralty and maritime jurisdiction,” leaving the courts to ascertain its limits, as cases may arise. And the precise case here .is, whether jurisdiction exists to try a case of collision taking place on the Mississippi river, on fresh water slightly influenced by the pressure of tide from the ocean, but within the body of the State of Louisiana, and between vessels propelled by steam, and navigating that river only. It is an extreme case ; still, its decision ■ either way must govern all others taking place in the bays, harbours, inlets,, and rivers of the United States where the tidé flows ; as the. rule is, that locality gives jurisdiction in cases of collision, and, that it exists if the influence of the tide'is at all felt (2 Browne’s Civil and Admiralty Law, 110 ; 7 Peters, 343). Where -this collision occurred, the influence of the tide was felt.
We have, then, presented, simply and broadly, the question whether the District Courts, when- acting as instance courts of, admiralty, have power to try any case-of collision occurring in the body of a county c)f any State.
In Great Britain, in 1776, when our separation from that country took place, the common law courts issued writs of prohibition to the Court, of Admiralty, restraining the exercise of this'jurisdiction in cases of collision taking place on rivers within the flow of tide, and within the body of an English county ; but the admiralty has continued at times to exercise the jurisdiction, nor do I think the validity of such a decree could be called in' question, becausé of the want of power. • In the British colonies on this’ continent, and elsewhere, the jurisdiction to proceed in rem (in such a case) has been undisputed, so far as I can ascertain, and a cause of collision in the instance court of admiralty is peculiarly' a suit, in wm, commencing with the arrest of the ship.'. Abbott on .Shipping, 233.
I agree with my dissenting brethren, that the constitution of the United States is an instrument and plan • of government founded in the common law, and that to common law terms *and- principles we must refer for a true understanding of it-, as a' .general rule having few exceptions ; and so, also, to the common law modes of proceeding .in the exercise of the judicial power we must refer as a general rule covering the whole ground of remedial justice to' be administered by the national courts.' To this them are two promi *467 nent exceptions ; first, the trial of cases in equity ; and, secondly, of cases of admiralty and maritime jurisdiction. .These may be tried according to the forms of the English chancery court, or the English admiralty court, and. without the intervention of. a jury.In chancery, the true limit of judicial power is prescribed by the sixteenth section of the Judiciary Act of 1789. ' The equity powers begin where the common law powers end,'in affording^ an adequate remedy., Sp, in: cases arising in bodies of counties (where the common law prevails) that would be cognizable in the admiralty had the cause of action arisen on the ocean, the English rule has been equally stringent in maintaining the common law remedies where they could afford plain and adequate relief. - And T think the case before us must be tested by the foregoing principles. The proceeding is against the vessel, which the decree condemns ; 'the case is the same as on a bottomry bond enforced against the vessel, or of a mortgage enforced in chancery. In neither case have the common law courts any power to afford relief, by enforcing the lien on the thing ; still, the. remedy at law, in case of the mortgage or the collision, is open to .the inj.ured party to proceed against the person ; that is, of the debtor in the one case, and against the trespasser in the other. By the maritime law, the vessel doing the injury is liable in rem for the tort; this is the right, and the remedy must be found somewhere. Chancery has no power to interfere, nor have the common law courts any power to seize the vessel and condemn hér ; and it seems to me to. be a strange dnomaly, .that where, no other court can afford the particular relief, in a case 'confessedly within the admiralty jurisdiction if occurring on the- ocean, that the power did not exut because the trespass tpok place in the body of a State and county..
I have thus briefly stated my reasons for sustaining admiralty jurisdiction in this instance, because of the divided opinions of the judges on the question; and because I do not intend to be committed to any ..views beyond those arising on the precise case before the court. I therefore concur that the jurisdiction exists. The -facts in my judgment authorize the affirmance of the decree below.