540 F.2d 629
 SEA-LAND SERVICE, INC.,
and
The Travelers Insurance Company, Petitioners,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, and Wallace C. Johns,
Respondents.
 No. 75-2039.
 United States Court of Appeals,
Third Circuit.
 Argued June 8, 1976.
Decided Aug. 5, 1976.
 
 M. E. DeOrchis, Kenneth L. Geller, Haight, Gardner, Poor & Havens, New York City, for petitioners.
 William J. Kilberg, Sol. of Labor, Laurie M. Streeter, Associate Sol., Linda L. Carroll, Atty., U. S. Dept. of Labor, Washington, D. C., for Director, Office of Workers' Compensation Programs.
 Martin L. Katz, Trial Counsel, Paul C. Johns, Brooklyn, N. Y., for respondent Wallace C. Johns.
 OPINION OF THE COURT
 Before ALDISERT, GIBBONS and GARTH, Circuit Judges.
 GIBBONS, Circuit Judge.
 
 
 1
 This is a petition by an employer to review an order of the Benefits Review Board reversing an order of the administrative law judge which denied benefits to an employee, Wallace Johns, under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA).[1] The administrative law judge had held that although Johns was engaged in maritime employment at the time of the accident, he was not injured at a situs within the coverage of the Act. The Board concluded that Johns was engaged in maritime employment and was injured at a covered situs. The problem arises out of the 1972 amendments to the LHWCA,[2] and is of first impression in this court.
 
 
 2
 Johns was employed at the time of the accident by Sea-Land Service, Inc., an intermodal freight carrier that engages in shipping, stevedoring, warehousing, freight consolidation and motor freight operations. Johns' injury occurred when the flatbed truck he was driving, laden with a large crate, overturned on a public street in Port Elizabeth, New Jersey. Port Elizabeth is a part of the sprawling marine terminal area in Newark and Elizabeth, New Jersey that is operated by the Port of New York and New Jersey Authority. Many longshoremen who are covered by the LHWCA are employed at various locations in the marine terminal area. Many other workers in the terminal area are employed by railroads, and are covered by the Federal Employers' Liability Act.[3] Still others, including teamsters, warehousemen, clerks, secretaries and even bank tellers, who work in the marine terminal area are covered by the New Jersey Workmen's Compensation Act.[4] All, or at least most, of these employees, are engaged in facilitating the transfer of cargo at the interface between waterborne modes of transportation and land or airborne modes of transportation. Our problem in this case is to determine on which side of the interface Johns was employed when he was injured. That his employer is an intermodal carrier complicates the problem somewhat, although analytically the fact that a single corporate employer operates several modes of transportation should not influence our judgment respecting the statutory reach of the federal and state workmen's compensation laws.
 
 
 3
 * Johns was a member of the International Longshoremen's Association, but he was not regularly employed by Sea-Land. On the date of the accident Johns had been hired by Sea-Land for the day (a "shape-up" employee) through the Bi-State Waterfront Commission, which operates a longshoring hiring hall. After appearing for work, Johns agreed to work as a shuttle driver, moving with a tractor rig trailers between Sea-Land's old terminal facility at Berth 52, and its new terminal at Berth 90. Both terminal facilities were enclosed by a fence and were under the control of the employer. The shuttle-run between the two terminals followed public streets for a distance greater than a mile and a half. Johns began his day by hitching a trailer to his tractor at Berth 52 and moving it to Berth 90. While he was making a turn from Rangoon Street onto Bombay Street, an intersection in the public area of the marine terminal, situated one-half mile from the nearest water and one-third mile from Sea-Land's property, the rig overturned and caused Johns' injury. On the day of the accident Sea-Land was in the process of moving its operations from Berth 52 to a larger facility at Berth 90.
 
 
 4
 Johns originally filed a claim against Sea-Land with the New Jersey Department of Labor and Industry. Payments were made under the New Jersey schedule from January 31, 1973 until March 16, 1973. On July 5, 1973 Johns filed a new claim under the federal statute, which provides for higher benefits. Sea-Land resisted that claim, contending that at the time of the injury the claimant was covered by the New Jersey and not the federal statute. The formal proceedings before the administrative law judge and the Benefits Review Board produced the results described above. Neither the administrative law judge nor the Board made any findings with respect to the contents of the crate that Johns was hauling at the time of the accident, its origin, or its destination. Nor did either make any finding as to whether a vessel was berthed at or expected at Berth 52. Under our interpretation of the 1972 amendments these facts may be of critical importance.
 
 II
 
 5
 Prior to 1972 the term "employee" was defined in § 2(3) of the LHWCA, 33 U.S.C. § 902(3) only negatively:
 
 
 6
 "The term 'employee' does not include a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."
 
 
 7
 The scope of the Act's affirmative coverage was derived from the definition of "employer" in § 2(4), and the "coverage" provision in § 3(a). An "employer" was described as an employer of persons "employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock.)" 33 U.S.C. § 902(4). Compensation was payable under § 3(a) "only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." 33 U.S.C. § 903(a). The pre-1972 definitions had originated in the 1927 statute, which was tailored by Congress to fill a void created by the Supreme Court's holding in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), that state workmen's compensation laws were inoperative in the navigable waters of the United States. See G. Gilmore & C. Black, The Law of Admiralty § 6-45 (2d ed. 1975). The Jensen decision left longshoremen injured on the landward side of a pier with a possible remedy under state workmen's compensation laws, but in the absence of federal legislation not covered when they stepped from the pier onto the gangplank. State Industrial Commission v. Nordenholt Corp., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933 (1922). The 1927 statute, instead of adopting federal coverage for the entire longshoring operation, merely provided a remedy which filled in the gap created by the Jensen holding. See Gilmore & Black, supra, § 6-48, at 417. In Nacirema Operating Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), the Court held that the Extension of Admiralty Jurisdiction Act of 1948, 46 U.S.C. § 740, did not change the basic approach of the 1927 statute, and that pierside injuries were still covered by state workmen's compensation laws. The Nacirema court made it clear, however, that there was no constitutional barrier to congressional action preempting the entire longshoremen's compensation field to the exclusion of state law.[5] It merely held that the 1927 statute could not be so construed. That holding pointed up the continuing anomaly that the schedule of benefits to be applied in any case depended on whether the injury occurred on the land or water side of the gangplank.
 
 
 8
 In 1972 Congress addressed this anomaly in a complex statute reflecting a number of compromises among conflicting interests.[6] Of concern for purposes of this case are the revised definitions of "employer," § 2(4), and "employee," § 2(3), and the revised "coverage" provision of § 3(a). In place of the merely negative definition of "employee" given by the 1927 Act (which excluded crew members), Congress substituted the following language:
 
 
 9
 "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."
 
 
 10
 33 U.S.C. § 902(3).
 
 
 11
 Thus the exclusion of crew members[7] was retained, but an affirmative listing of occupations functionally related to the maritime transportation industry was added. For this case the key words are "longshoreman or other person engaged in longshoring operations."
 
 
 12
 The 1972 amendments also changed the "employer" definition by omitting the limitation "upon the navigable waters of the United States" and substituting
 
 
 13
 "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."
 
 
 14
 33 U.S.C. § 902(4).
 
 
 15
 The new definition quite clearly was intended to afford coverage in places which under the 1927 statute had been left to the state workmen's compensation acts. That this was intended is confirmed by the "coverage" provision. The 1972 amendment to § 3(a) omitted the qualification "and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law," and thus abandoned the 1927 approach of providing a mere interstitial remedy which deferred to state law to the maximum extent permissible under the Jensen holding. As amended, § 3(a) provides:
 
 
 16
 "Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . . "
 
 
 17
 33 U.S.C. § 903(a).
 
 
 18
 Thus the "coverage" provision and the "employer" definition manifest an unmistakable congressional intention to afford federal coverage for injuries occurring in areas inland of the navigable waters of the United States where prior to 1972 Congress had deferred to state law. See generally Gilmore & Black, supra, § 6-50.
 
 III
 
 19
 In considering the merits of Johns' claim for compensation under the LHWCA as amended, both the administrative law judge and the Benefits Review Board construed the Act to posit twin requirements for coverage. In the definition of "employee" they perceived a "status" test, i. e., whether Johns was "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations. . . . The Board and the administrative law judge understood § 2(4), the employer definition section, to impose an additional requirement for coverage; namely, that an accident occur upon the navigable waters of the United States (including enumerated adjoining facilities). The Board and the administrative law judge agreed that Johns satisfied the status test. The administrative law judge concluded, however, that the accident took place at a situs that the 1972 amendments did not reach. It was this latter conclusion with which the Benefits Review Board disagreed.[8] Because of the inadequacy of the record compiled in the administrative proceedings, we are not in position to either approve or disapprove the Board's decision and must remand for additional fact-finding. Nor are we certain that the Board has properly interpreted the scope of the 1972 amendments, a task of no little difficulty as several diverging opinions demonstrate. See, e. g., Pittston Stevedoring Corp. v. Dellaventura, --- F.2d ----, No. 76-4042 (2d Cir. July 1, 1976); I. T. O. Corp. v. Benefits Review Board, 529 F.2d 1080 (4th Cir. 1975), rehearing en banc granted, (March 12, 1976); Weyerhaeuser Co. v. Gilmore, 528 F.2d 957 (9th Cir. 1975), petition for cert. filed, 44 U.S.L.W. 3645 (U.S. May 6, 1976) (No. 75-1620), and one to which we now turn.IV
 
 
 20
 As has been noted, see Southern Pacific Co. v. Jensen,supra, the Constitution forbids state compensation laws to intrude on the navigable waters of the United States. On those waters the federal law-making power is exclusive, but the scope of congressional power to enact federal compensation legislation pursuant to its admiralty jurisdiction is, of course, defined by the test of navigability. State Industrial Commission v. Nordenholt Corp., supra; Victory Carriers, Inc. v. Law, 404 U.S. 202, 210, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). Doubtless Congress could, in lawful exercise of its commerce power, have supplanted state workmen's compensation remedies throughout the entire range of interstate and foreign commerce. But if a suit for workmen's compensation is an action at law for purposes of the seventh amendment, then any federal compensation law whose coverage extended beyond the limits of admiralty jurisdiction could not be administered under the existing scheme, without provision for jury trial. See Frank Irey, Jr., Inc. v. OSHRC, 519 F.2d 1200, 1207 (3d Cir. 1974), on rehearing in banc, 519 F.2d 1215, 1219 (3d Cir. 1975) (Gibbons, J., dissenting), cert. granted, --- U.S. ----, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976) (No. 75-748); United States v. Stoeco Homes, Inc., 498 F.2d 597, 609-10 (3d Cir. 1974), cert. denied, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975). To the extent that compensation claims concern subject matter within Congress' legislative jurisdiction in admiralty, however, it is well-settled that no right to jury trial exists. Crowell v. Benson, 285 U.S. 22, 45, 52 S.Ct. 285, 76 L.Ed. 598 (1932); Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 452-53, 459-60, 13 L.Ed. 1058 (1851); Waring v. Clarke, 46 U.S. (5 How.) 441, 459-60, 12 L.Ed. 226 (1847). Because we assume Congress was aware of the administrative difficulties that would attend upon a commerce-based federal compensation law, we do not believe that in enacting the 1972 amendments to the LHWCA, Congress intended to exercise any legislative power other than its admiralty jurisdiction.[9] See Pittston Stevedoring Corp. v. Dellaventura, supra, --- F.2d ---- at ----, No. 76-4042 at 4720-22; Gilmore & Black, supra, § 6-48 at 417-18. Our problem then, is to decide the extent to which Congress has exercised the power vested in it by Article III, Section 2 of the Constitution. Panama R. R. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 68 L.Ed. 748 (1924).
 
 
 21
 It seems likely, although by no means certain, that Congress could, pursuant to its admiralty jurisdiction, enact a comprehensive workmen's compensation law for maritime employees that provided coverage for injuries sustained in such employment, no matter where they may occur. Justice Story described the admiralty jurisdiction in tort as limited to events actually taking place on the waters, see DeLovio v. Boit, 7 Fed.Cas. No. 3,776, p. 418, 444 (C.C.D.Mass. 1815), while at the same time describing admiralty jurisdiction in contract as comprehending:
 
 
 22
 "all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea."
 
 
 23
 Id. See also Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 35, 20 L.Ed. 90 (1870). A claim for compensation for personal injury on a theory of strict liability does not fit perfectly into the mold of either admiralty tort or admiralty contract law. We find guidance in determining the limits of congressional law-making authority respecting such subject matter in contract and other cases where the jurisdictional limits are not spatially defined, but depend on the presence of a nexus between the employer-employee relationship and maritime commerce. The maintenance and cure cases are particularly good analogies, because the seaman's right to maintenance and cure is closely related to the workman's right to compensation without fault for injury or death. See Gilmore & Black, supra, § 6-6, at 281-82. The right to maintenance and cure arises from the fact of the employment relationship (in the service of the ship) and amounts virtually to strict liability. It is now clearly established that a seaman who is stricken with illness or injury is entitled to maintenance and cure even though the accident or illness occurs during shore leave not directly connected with the ship's business. See Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 (1951); Farrell v. United States, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (1949); Aquilar v. Standard Oil Co., 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107 (1943). By the same token, it should be within Congress' legislative jurisdiction under Article III, Section 2 to provide a remedy for persons injured in the course of maritime employment, irrespective of the place of injury. It is the existence of the special employer-employee relationship, and not the situs of that relationship, that is significant for purposes of admiralty jurisdiction. We find support for this thesis in Victory Carriers, Inc. v. Law, supra, where the Supreme Court indicated that only congressional inaction stood between the Court's acquiescence in the extension of admiralty tort jurisdiction shoreward from its historical outpost on the edge of the navigable waterways. See 404 U.S. at 204, 214, 92 S.Ct. 418. See also Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1962).
 
 
 24
 Having fixed the limits of congressional law-making authority in admiralty, it remains to be considered the extent to which Congress in the 1972 amendments to the LHWCA invoked that power. We are met at the outset with a conflict of authority. Both the administrative law judge and the Benefits Review Board employed concurrent tests of "status" and "situs" to define the Act's coverage. Accord, I. T. O. Corp. v. Benefits Review Board, supra. Gilmore and Black acknowledge that there is evidence in the legislative history suggesting that Congress intended to structure the Act's coverage in such a fashion, but urge for policy reasons that the status test be discarded and the situs test be made determinative. See Gilmore & Black, supra, § 6-51. Judge Friendly rejects this latter position, but concededly adopts an approach that "goes some way" toward "read(ing) the status requirement out of the Act." Pittston Stevedoring Corp. v. Dellaventura, supra, --- F.2d ----, at ----, No. 76-4042 at 4719. Although we find merit in these positions, we prefer to view the problem from a fresh perspective.
 
 
 25
 Prior to the 1972 amendments to the LHWCA, coverage analysis of necessity involved application of the bifurcated status-situs test. The Jensen case fixed the constitutional limit of the state law-making authority to which Congress deferred at the boundary of congressional legislative jurisdiction in admiralty, i. e., at the edge of the navigable waterways. The 1927 Act established a federal compensation remedy for maritime employees, but only to the extent necessary to fill Jensen's preemptive void. There was a perfect interface, without overlap, between federal and state law, see Nacirema Operating Co. v. Johnson, supra, and courts were forced to consider in each case, from the location of the accident, whether state or federal remedies were to be provided.
 
 
 26
 In the 1972 amendments, however, Congress abandoned the policy of deference to state law-making power. It invaded what had theretofore been the sole preserve of the states by extending the LHWCA's coverage to some part of the domain in which the states could legislate. The line delimiting the outer reaches of the Act's extended coverage is, we think, functional and not spatial.
 
 
 27
 Apart from increasing the maximum allowable benefits in exchange for the elimination of the Sieracki-Ryan[10] circle of liability, the dominant purpose of the 1972 amendments in extending the Act's coverage to areas previously left to the states was to make more uniform the death and disability compensation system for maritime employees so that maritime workers would no longer walk into federal coverage and out of state coverage, and vice versa, in the course of a day's work. This sentiment is clearly expressed in identical language in both the House and Senate reports accompanying the legislation:
 
 EXTENSION OF COVERAGE TO SHORESIDE AREAS
 
 28
 The present Act, insofar as longshoremen and ship builders and repairmen are concerned, covers only injuries which occur "upon the navigable waters of the United States." Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.
 
 
 29
 To make matters worse, most State Workmen's Compensation laws provide benefits which are inadequate; even the better State laws generally come nowhere close to meeting the National Commission on State Workmen's Compensation Laws recommended standard of a maximum limit on benefits of not less than 200% of statewide average weekly wages. . . .
 
 
 30
 It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.
 
 
 31
 The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel.
 
 
 32
 The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e. a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters.
 
 
 33
 S.Rep.No.92-1125, 92d Cong., 2d Sess. 12-13 (1972); H.R.Rep.No.92-1441, 92d Cong., 2d Sess., 1972 U.S.Code Cong. & Admin.News, pp. 4707-08. The reference in §§ 902(4) and 903(a) to the navigable waters of the United States should be regarded no more than a shorthand way of relating the function being performed by the injured employee to waterborne transportation, the jurisdictional nexus. We recognize that both of these statutory provisions, as amended in 1972, further state that the "navigable waters" shall include "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." But we do not construe this enumeration of covered areas to be an exclusive enumeration. Congress was cautious in its language, but the fact remains that it intended to expand the scope of the LHWCA to provide a federal workmen's compensation remedy for all maritime employees. We believe that Congress has exercised in full its legislative jurisdiction in admiralty. As long as the employment nexus (status) with maritime activity is maintained, the federal compensation remedy should be available. Resuscitating the situs requirement in cases satisfying the status test will interfere with Congress' intention to eliminate the phenomenon of shifting coverage. It is the situs of the vessels in maritime commerce, not the situs of their maritime employees at the time of the injury, that in our view Congress referred to by its reference to navigable waters.
 
 
 34
 We concede, as we must, that the draftsmanship of the 1972 amendments leaves something to be desired and, to a certain extent, obscures this purpose from view. But the overall intention appears to be to afford federal coverage to all those employees engaged in handling cargo after it has been delivered from another mode of transportation for the purpose of loading it aboard a vessel, and to all those employees engaged in discharging cargo from a vessel up to the time it has been delivered to a place where the next mode of transportation will pick it up. A stevedore may receive cargo at one situs and move it over public streets to another situs for loading on a vessel, or may discharge cargo and transport it to a situs not immediately adjacent to a pier for delivery to a truck or rail carrier. The limits of federal coverage is defined not by reference to a geographic relationship with the navigable waters of the United States, but by the location of the interface between the air land and the water modes of transportation. If that interface is customarily located at some point remote from the pier, the fact that the stevedore uses public streets to move the cargo to or from a "terminal", a "building" or "other adjoining area" does not affect coverage. The key is the functional relationship of the employee's activity to maritime transportation, as distinguished from such land-based activities as trucking, railroading or warehousing.
 
 
 35
 We believe that our view of the 1972 amendments is in substantial conformity with that of Judge Craven, dissenting from the panel opinion in I. T. O. Corp. v. Benefits Review Board, supra. In that case a divided court held that the 1972 amendments preserved the dual status-situs test for coverage, and that federal coverage began at the "first storage or holding area on the pier, wharf, or terminal adjoining navigable waters", and ended at the "last storage or holding area on the pier, etc., to the ship," which it called the "point of rest." 529 F.2d at 1087 (emphases in original). Judge Craven in dissent rejected the "point of rest" analysis as inconsistent with the plain language of the Act, accord, Pittston Stevedoring Corp. v. Dellaventura, supra, --- F.2d ----, at ----, No. 76-4042 at 4712, and urged that longshoring under the statute was a continuous process involving different employees, which continued at all times while the cargo was in maritime commerce as distinguished from land commerce. Although Judge Craven's terminology and ours are somewhat different, we think that our perceptions of the congressional intention are essentially the same. The line which Congress intended to draw was between maritime commerce and land commerce, and the coverage of the federal law starts at the point where the cargo passes to or from an employer engaged in the former to an employer engaged in the latter. That the one employer may be engaged in both types of commerce is irrelevant. The line should still be drawn where cargo is delivered to a segregated place for delivery to the next mode of transportation.
 
 
 36
 We note that defining the scope of federal workmen's compensation coverage in this manner is consistent with the provisions of the Harter Act, 46 U.S.C. § 193, and the Carriage of Goods by Sea Act, 46 U.S.C. § 1303(3), defining the point at which the responsibility of the maritime carrier begins. While these statutes do not tell us what the Ninety-Second Congress had in mind when it passed the LHWCA amendments, there is some virtue in a construction of the latter statute that produces consistency with other enactments relating to maritime commerce.
 
 V
 
 37
 We are thus in agreement with the Benefits Review Board that coverage under the Act is not foreclosed by the fact that the accident occurred on a public street in the marine terminal not under the employer's control. But that conclusion only begins the appropriate inquiry. On the day of the accident, according to the evidence, Johns, at Berth 52, hitched a Sea-Land tractor to a container which had just come off a ship at that berth, and took the container to Berth 90, where Sea-Land stored containers. If Johns were an over-the-road driver who picked up the trailer on the pier for delivery to a consignee elsewhere, we would have no difficulty in holding that the interface between water and land transportation took place at Berth 52 and that New Jersey law covered any subsequent injury to the driver. On the other hand, transporting a discharged container to a temporary storage area at Berth 90 appears equally clearly to be related to the stevedoring function rather than to the land transportation function. Likewise, if the crate which Johns was moving at the time of the accident had been received at Berth 90 from a land mode of transportation, or even another water carrier, for temporary storage until it could be loaded on a vessel, and Johns was moving it to Berth 52 to be so loaded, we would hold that there was federal coverage at the time of the accident.
 
 
 38
 Our difficulty is that while the evidence respecting Johns' initial trip between Berth 52 and Berth 90 is clear enough, the record is decidedly equivocal about the return trip, during which the accident occurred. Johns testified that he thought the crate was full and was going to a ship, but he gave no information about its source and no other information about its destination. The testimony of William Warnock, the employer's claims adjuster, suggested that Johns may have been mistaken, and may actually have been shuttling equipment between the two terminals, where warehousing and the storage of trailers also takes place. Neither the administrative judge nor the Board made specific findings on this crucial issue. What is clear is that shape-up laborers, hired by the day, are sometimes used to perform what are clearly tasks in maritime employment and are sometimes used in Sea-Land's trucking and warehousing operations. All are members of the longshoremen's union, but obviously that fact is not dispositive of the reach of the federal statute. A great deal of the evidence and argument in the agency proceedings was devoted to the situs of the accident and to control over that situs. Evidence bearing upon the specific function of Johns at the time of injury was inadequately developed. Because the inquiry in the proceedings below was misdirected, a remand is necessary.
 
 VI
 
 39
 The Director, Office of Workers' Compensation Programs, contends that Sea-Land's petition for review should be dismissed because the employer did not cross-appeal to the Benefits Review Board from the favorable decision of the administrative law judge. The simple answer is, as we pointed out in Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Compensation Programs, No. 75-1810 (3d Cir. June 23, 1976), that the employer was not aggrieved by that order and could not take an appeal therefrom to the Benefits Review Board. 33 U.S.C. § 921(b)(3); 20 C.F.R. § 802.201(a) (1974). Sea-Land was aggrieved by the Board's action, however, and properly seeks judicial review.
 
 CONCLUSION
 
 40
 The order of the Benefits Review Board will be set aside and the case will be remanded for a determination, consistent with this opinion, as to whether at the time of the injury Johns was engaged in maritime or non-maritime employment. On remand the trier of fact[11] may take additional testimony on that issue if in its view the present record does not contain sufficient evidence for that purpose.
 
 
 
 [1]
 33 U.S.C. §§ 901-50. We have jurisdiction under 33 U.S.C. § 921(c), for although the Benefits Review Board ordered a remand to the administrative law judge for the calculation of the exact amount of benefits, that calculation was made and the order was for all purposes final by the time this court was called upon to consider the petition. Compare Sun Shipbuilding & Dry Dock Co. v. Benefits Review Board, 535 F.2d 758 (3d Cir. 1976)
 
 
 [2]
 Pub.L.No.92-576, 86 Stat. 1251
 
 
 [3]
 45 U.S.C. §§ 51-60
 
 
 [4]
 N.J.Stat.Ann. § 34:15
 
 
 [5]
 The Court said:
 There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the Extension Act to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act. And construing the Longshoremen's Act to coincide with the limits of admiralty jurisdiction whatever they may be and however they may change simply replaces one line with another whose uncertain contours can only perpetuate on the landward side of the Jensen line, the same confusion that previously existed on the seaward side. While we have no doubt that Congress had the power to choose either of these paths in defining the coverage of its compensation remedy, the plain fact is that it chose instead the line in Jensen separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court.
 396 U.S. at 223-24, 90 S.Ct. at 354.
 
 
 [6]
 We have considered other aspects of the 1972 amendments in Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Compensation Programs, --- F.2d ---- (3d Cir. 1976) and Nacirema Operating Co. v. Benefits Review Bd., 538 F.2d 73 (3d Cir. 1976). See also Griffith v. Wheeling Pittsburgh Steel Corp., 521 F.2d 31, 38-41 (3d Cir. 1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976)
 
 
 [7]
 Crewmen may, of course, recover for injury under the Jones Act, 46 U.S.C. § 688
 
 
 [8]
 The Board's entire discussion of this point of disagreement was set out in two paragraphs:
 The administrative law judge relied essentially on Perdue v. Jacksonville Shipyards, Inc., 74-LHCA-58 (Sept. 19, 1974), in determining that the accident did not occur upon "navigable waters". The Board has since reversed that decision, and no purpose would be served by restating our reasoning here. See Perdue v. Jacksonville Shipyards, Inc., 1 BRBS 297, BRG No. 74-200 (Jan. 31, 1975).
 The Act does not require that the injury occur on property owned by the employer. It is enough if the accident takes place in an " . . . adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel." 33 U.S.C. § 903(a). The situs of claimant's injury qualifies as such an area since it is directly related to, and an essential part of, the employer's longshoring operations. To hold otherwise would contravene the legislative intent of the 1972 amendments to the Act, which were enacted, in part, to eliminate the circumstance of having persons engaged in maritime employment walk into and out of the Act's coverage during the workday. See Herron, Jr. v. Brady Hamilton Stevedore Co., 1 BRBS 273, BRB No. 74-171 (Jan. 23, 1975); O'Leary v. Southeast Stevedore Co., 1 BRBS 498 BRB No. 74-228 (May 30, 1975).
 
 
 [9]
 The problem of tracing congressional legislation to its intended constitutional source is often perplexing in the maritime context because admiralty jurisdiction closely interfaces with commerce jurisdiction. When Congress in 1845 extended admiralty jurisdiction to the Great Lakes and navigable waters connecting same, Act of Feb. 26, 1845, 5 Stat. 726, it was much mooted whether the Act was a regulation of commerce or of admiralty. There is some evidence that Justice Story, the draftsman of the legislation, regarded the Act as an exercise of commerce power, although the Supreme Court sustained the Act on the latter ground, expressly disavowing the commerce clause basis. See Propeller Genesee Chief v. Fitzhugh, supra. For an absorbing discussion of the problem see C. Swisher, History of the Supreme Court of the United States, Vol. 5: The Taney Period, 1836-64 at 423-66 (1974)
 
 
 [10]
 Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). See Griffith v. Wheeling Pittsburgh Steel Corp., supra, 521 F.2d at 38-40
 
 
 [11]
 Under the statute the administrative law judge and not the Benefits Review Board is the trier of fact. See 33 U.S.C. § 921(b)(3)