545 F.2d 374
 DRAVO CORPORATION and Liberty Mutual Insurance Company, Petitioners,
v.
Louis MAXIN and United States Department of Labor, Benefits
Review Board, Respondents,
The Director, Office of Workers' Compensation Programs, U.
S. Department of Labor, Party-Respondent.
 No. 75-2403.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 10, 1976.
Decided Nov. 15, 1976.
 
 Frederick N. Egler and Robert S. Garrett, Egler & Reinstadtler, Pittsburgh, Pa., for petitioners.
 Daniel W. Cooper, Gatz, Cohen, Segal & Koerner, Pittsburgh, Pa., for respondent Maxin.
 William J. Kilberg, Solicitor of Labor, Laurie M. Streeter, Associate Solicitor, Joshua T. Gillelan, II, Atty., U. S. Dept. of Labor, Washington, D. C., for Party Respondent, Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor.
 OPINION OF THE COURT
 Before VAN DUSEN, HUNTER and WEIS, Circuit Judges.
 VAN DUSEN, Circuit Judge.
 
 
 1
 This is a petition by an employer to review an October 20, 1975, decision (100a-104a) of the Benefits Review Board (BRB), United States Department of Labor, affirming the decision of the administrative law judge that the claimant, Louis Maxin, was covered by the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), as amended in 1972.[1] Although Judge Gibbons stated in his recent opinion in Sea-Land Service, Inc., et al. v. Director, etc., and Wallace C. Johns, 540 F.2d 629, Opinion of Aug. 5, 1976 (3d Cir.) (hereinafter Johns ), which involved a claimant allegedly engaged in longshoring operations, that the above 1972 Amendments "manifest an unmistakable congressional intention to afford federal coverage for injuries occurring in areas inland of the navigable waters of the United States,"[2] id. at 634, this case is the first time that we have considered whether Congress could constitutionally extend the coverage of the LHWCA to land based workers in the shipbuilding industry. We affirm the October 20, 1975, decision of the BRB.
 
 
 2
 There is little dispute concerning the essential facts. The claimant, Louis Maxin, is an employee of Dravo Corporation (hereinafter "Dravo") who, on October 29, 1973, sustained an injury resulting in below-knee amputations of both legs while working for Dravo's Engineering Works Division (EWD) at its plant on Neville Island near Pittsburgh, Pennsylvania. At the time of his injury, Maxin was working in the Neville Island structural steel shop, his usual place of employment, burning steel plates which would ultimately become bottoms and decks of barges fabricated by Dravo at the Neville Island facility.
 
 
 3
 Neville Island is located in the Ohio River, a navigable waterway. The plant is closest to the southern shore of the river and generally extends towards the north. The main stream of the river is on the north side of the facility. On the south side is a lesser stream called the back channel. The entire facility is split north and south by Grand Avenue, a public thoroughfare. On the north side of Grand Avenue are the marine ways, boat yards, barge shop and other facilities of the EWD. On the south side of Grand Avenue are the structural shop and other facilities of the EWD (as well as the separate facilities of the Sand and Gravel Division), extending to the back channel which is navigable for most of its length. Historically, certain areas of the plant have always been considered by the parties to be subject to the jurisdiction of the LHWCA. This area includes the marine ways and the launching ways immediately adjacent to the water's edge on the north side. EWD designs and builds large tow boats, barges, steelmill equipment, and power plant equipment.
 
 
 4
 In addition to the structural shop, eight major areas of the Neville Island facility can be identified as connected with boat building or repair. The enclosed structural shop is about 2000 feet from the north channel of the river. In the structural shop, pre-assembly components of all types, including those of barges, towboats, damlocks, engine foundations, etc., are carried out. Some of the components such as "rake ends" range from 40 to 60 feet in width and 20 feet in length. Components fabricated in the structural shop are transported on rail cars to other areas for assembly. The major raw material used in the construction of vessels is steel. The majority of the steel is delivered to a storage area adjacent to the structural shop by truck or rail car. It is then brought into the structural shop as needed, where it is shaped, cut, punched and welded to the desired configuration.
 
 
 5
 In addition to marine construction, pelletizing machines and "feeders," which are used in handling iron ore and in making steel, are also built in the structural shop. No other areas in the facility beside the structural shop are used for other than marine fabrication. During the previous 12-month period, about eight pelletizing units were built. In that same period, about 300 barges and towboats were constructed. The employees in the structural shop may spend 15% of their time on non-marine work and 85% on marine work. 90% of the raw steel delivered to the shop finds its way into the marine products. The employees are assigned as needed; they do not specialize in either marine or non-marine work. Grand Avenue generally separates the structural shop from the pre-assembly and final assembly areas. To the extent that employees in the structural shop may be assigned to non-shipbuilding activities, the assignments are incidental and sporadic as the needs of the moment dictate. There is no delineation of labor between shipbuilding and non-shipbuilding functions (for example, the manufacture of pelletizing machines and "feeders").
 
 
 6
 On this appeal, Dravo raises a number of contentions challenging the award made to the claimant, as follows:
 
 
 7
 I. The Congress could not constitutionally extend coverage under the LHWCA landward to employees working in new ship construction.
 
 
 8
 II. Maxin, as a burner employed in metal fabrication at a preliminary stage of boat building, was not a shipbuilder or maritime employee within the meaning of the 1972 Amendments.
 
 
 9
 III. The injury did not take place at a situs within the landward extension
 
 
 10
 of the 1972 Amendments. I. THE CONSTITUTIONALITY OF
 
 EXTENSION OF COVERAGE UNDER THE LHWCA TO THE
 SHIPBUILDING INDUSTRY
 A. The Landward Extension
 
 11
 The 1972 Amendments extended the coverage of the earlier Longshoremen's and Harbor Workers' Compensation Act of 1927 (hereinafter "1927 Act") landward to employees "engaged in maritime employment" who were already covered by the 1927 Act while working upon navigable waters. Sea-Land v. Johns, supra at 636-637. Prior to the enactment of the 1972 Amendments, the Supreme Court had clearly indicated in a number of opinions that the coverage of the 1927 Act, ending at the water's edge, was not coterminous with the full geographical extent of the limits of maritime jurisdiction. See, e. g., Nacirema Operating Co. v. Johnson, 396 U.S. 212, 223-24, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). This history has already been extensively reviewed in a recent opinion of this Circuit, see Johns, supra at 636, deciding that, in a case such as this, Congress' landward extension of the LHWCA's coverage was authorized by the United States Constitution (see footnotes 2 above and 4 below).
 
 B. The Subject Matter Extension
 
 12
 The revised definition of "employee" in 33 U.S.C. § 902(3), as amended (§ 2(a) of P.L. 92-576, which contains the 1972 Amendments),[3] provides:
 
 
 13
 "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."
 
 
 14
 (Emphasis supplied.)
 
 
 15
 We note that although new ship construction contracts and the vessel itself until launched have been held traditionally not to be a subject of maritime jurisdiction, North Pacific S.S. Co. v. Hall Brothers Marine Ry. & Shipping Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919); The General Smith, 17 U.S. (4 Wheat.) 438, 4 L.Ed. 609 (1819), shipbuilding employees were covered under the LHWCA prior to the 1972 Amendments if they were injured while working on new vessels under construction and afloat upon navigable waters. E. g., Calbeck v. Travelers Insurance Co., 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). This case, therefore, is not one that involves extension of the LHWCA to a class of employees who were entirely outside of the Act's coverage prior to 1972. As stated in Johns, supra at 637:
 
 
 16
 "(T)he dominant purpose of the 1972 Amendment in extending the Act's coverage to areas previously left to the states was to make more uniform the death and disability compensation system for maritime employees so that maritime workers would no longer walk into federal coverage and out of state coverage, and vice versa, in the course of a day's work."
 
 
 17
 (Emphasis supplied.)
 
 
 18
 The reasoning of Judge Gibbons in Johns and the result in Calbeck support our conclusion that a landward extension of the LHWCA to shipbuilding employees such as Maxin was a constitutional exercise of Congress' Article III power.
 
 
 19
 Our conclusion is reinforced by the consideration that when, on a number of other occasions, the Congress altered the substantive rules of maritime law or enlarged the classes of cases falling within the admiralty and maritime jurisdiction itself, the Supreme Court of the United States has sustained the congressional determination.[4] In Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934), the Supreme Court discussed Congress' authority to confer admiralty and maritime jurisdiction on the federal courts in classes of cases which had previously been held by the Court to be outside the jurisdiction:
 
 
 20
 "The Congress (rests) its authority upon the constitutional provisions extending the judicial power 'to all cases of admiralty and maritime jurisdiction' and conferring upon the Congress the power to make all laws which shall be 'necessary and proper' for carrying into execution all powers 'vested by this Constitution in the government of the United States, or in any department or officer thereof.' Art. III, § 2; Art. I, § 8, par. 18. This authority was not confined to the cases of admiralty and maritime jurisdiction in England when the Constitution was adopted. Waring v. Clarke, 5 How. 441, 457, 458 (12 L.Ed. 226). The limitations which had been imposed upon the high court of admiralty in the course of its controversy with the courts of common law were not read into the grant. But the grant presupposed a 'general system of maritime law' which was familiar to the lawyers and statesmen of the country, and contemplated a body of law with uniform operation. The Lottawanna, 21 Wall. 558, 574, 575 (22 L.Ed. 654). The Constitution did not undertake to define the precise limits of that body of law or to lay down a criterion for drawing the boundary between maritime law and local law. Id. Boundaries were to be determined in the exercise of the judicial power in recognition of the purpose of the grant. 'No state law can enlarge it, nor can an act of Congress or rule of court make it broader than the judicial power may determine to be its true limits.' The St. Lawrence, 1 Black 522, 527 (17 L.Ed. 180). The framers of the Constitution did not contemplate that the maritime law should remain unalterable. The purpose was to place the entire subject, including its substantive as well as its procedural features, under national control. From the beginning the grant was regarded as implicitly investing legislative power for that purpose in the United States. When the Constitution was adopted, the existing maritime law became the law of the United States 'subject to power in Congress to modify or supplement it as experience or changing conditions might require.' Panama Railroad Co. v. Johnson, 264 U.S. 375, 385-387 (44 S.Ct. 391, 393, 68 L.Ed. 748). The Congress thus has paramount power to determine the maritime law which shall prevail throughout the country. The Lottawanna, supra, (21 Wall.) p. 577; Butler v. Boston & Savannah S.S. Co., 130 U.S. 527, 557 (9 S.Ct. 612, 32 L.Ed. 1017); In re Garnett, 141 U.S. 1, 13 (11 S.Ct. 840, 35 L.Ed. 631); Southern Pacific Co. v. Jensen, 244 U.S. 205, 215 (37 S.Ct. 524, 61 L.Ed. 1086); Crowell v. Benson, 285 U.S. 22, 39 (52 S.Ct. 285, 76 L.Ed. 598); United States v. Flores, 289 U.S. 137, 148, 149 (53 S.Ct. 580, 77 L.Ed. 1086). But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction. . . .
 
 
 21
 "The fact (that earlier court decisions had held the subject matter to be without the maritime jurisdiction) was not conclusive as to the constitutional authority of the Congress to alter or supplement the maritime law in this respect, and thus to extend the admiralty jurisdiction, 'as experience or changing conditions might require,' while keeping within a proper conception of maritime concerns. . . .
 
 
 22
 "The authority of the Congress to enact legislation of this nature was not limited by previous decisions as to the extent of the admiralty jurisdiction. We have had abundant reason to realize that our experience and new conditions give rise to new conceptions of maritime concerns. These may require that former criteria of jurisdiction be abandoned . . .."
 
 
 23
 Id. at 42-44, 48, 52, 55 S.Ct. at 38 (footnotes omitted). We conclude the standard of The Thomas Barlum has been met in 33 U.S.C. § 902(3).[5]
 
 II. THE CLAIMANT'S STATUS
 
 24
 On this appeal, Dravo argues that shipbuilding is "sufficiently distinct from fabrication to provide an appropriate limit" for the Act's coverage only at "the place where the keel or bottom of the vessel is laid down and the work of shipbuilding can properly be said to commence." Dravo's brief at 28-32. We reject this approach for two reasons: first, this court has already examined and rejected an analogous view held by the Fourth Circuit in regard to longshoring operations, see Johns, supra at 638-639; second, implementation by us of Dravo's suggested distinction would, in effect, partially overrule Johns, supra, where the analysis focused principally on the relationship between the employer and the claimant. In addition, Dravo's test would resurrect the pre-1972 problem of excessive litigation caused in part by pre-1972 judicial doctrines[6] which the Congress attempted to discard by extending the coverage of the LHWCA landward. Moreover, the test proposed would arbitrarily foreclose otherwise meritorious claims simply because of the definition placed by the employer upon the employment relationship. This disposition would be unfortunate insofar as it would tend to confine the judicial inquiry into a mere search for labels and talismanic rubrics. We note that other courts have rejected similar labeling approaches. See, e. g., Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, Opinion of September 27, 1976 (5th Cir.).
 
 
 25
 In Johns, supra at 636, this Circuit held that the test of coverage under the landward extension of the 1972 Amendments was to be a "status" test related to the employee's function in the employer's operation and dependent upon "the existence of (a) special employer-employee relationship and not the situs of that relationship." Having concluded that Congress could extend the coverage of the LHWCA to land-based shipbuilders, we must now determine if the BRB properly concluded that the claimant's employment relationship with Dravo fell within the parameters of the term "shipbuilder."[7]
 
 
 26
 Unfortunately, the term "shipbuilder" was not defined by the Congress in the 1972 Amendments; therefore, we must resort to other sources to determine if the functional relationship of Maxin's activities to Dravo's shipbuilding operations was maritime in character. The Encyclopaedia Britannica offers a general outline of shipbuilding and ship repair activities. In 20 Encyclopaedia Britannica 410-13 (1967), under the heading "Steps In Constructing A Ship," the following language appears:
 
 
 27
 "Fabrication and Assembly. The plate and angle shop shears, acetylene torch equipment, planers, bending rolls, presses, furnaces, drill and counter-sink machines and other equipment prepare the finished steel plates and shapes ready for subassembly or for erection in the ship. After fabrication, the plates and shapes, if riveted, are usually moved directly to the ship by cranes; shipwrights then adjust them in final positions and secure them by a few bolts passed through the rivet holes."
 
 
 28
 Comparison of the Britannica's outline with Dravo's structural shop operations at Neville Island compels the conclusion that functionally both are substantially identical. On the facts of this case, it is clear that Maxin's employment functions for Dravo at Neville Island were an integral part of the new ship construction activities conducted there. We conclude, therefore that the claimant satisfied the "functional relationship" test of Johns and that this record shows that there is a reasonable legal basis for the BRB's conclusion.[8]III. THE SITUS OF THE INJURY
 
 
 29
 Dravo contends that the structural shop was not an area within the extended coverage of 33 U.S.C. § 903(a), as amended (§ 2(c) of P.L. 92-576), which provides:
 
 
 30
 "Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . ."
 
 
 31
 With regard to this issue, Dravo again advances the argument that the coverage of the 1972 Amendments "should extend no further than the place where the keel or bottom of the vessel is laid down and the vessel begins the progressive steps of assembly which culminate in its launching." Brief at 39. In addition, Dravo suggests that because the structural steel shop was a distance of 2000 feet from the north channel and separated from most of the Neville Island facilities by Grand Avenue,[9] it cannot be an "adjoining area" within the meaning that Congress intended the courts to impart by the wording of § 903(a), as amended. The answer to these contentions was recently provided in Johns, supra at 638, where, in discussing the extent of the expanded coverage of the 1972 Amendments, Judge Gibbons said:
 
 
 32
 "The reference in § . . . 903(a) to the navigable waters of the United States should be regarded no more than a shorthand way of relating the function being performed by the injured employee to waterborne transportation, the jurisdictional nexus. We recognize that both of these statutory provisions, as amended in 1972, further state that the 'navigable waters' shall include 'any adjoining pier, wharf, drydock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel.' But we do not construe this enumeration of covered areas to be an exclusive enumeration."[10]
 
 
 33
 Our analysis in part II above and the wording quoted before from Johns, supra, provides an adequate answer to Dravo's contentions. To the extent that situs has relevancy under Johns, we conclude that Dravo's Neville Island structural steel fabrication shop is covered by the Act. The Neville Island facility adjoins navigable waters. The great majority of the work performed in the shop is related to shipbuilding or ship repair. There is no delineation of the work into shipbuilding and non-shipbuilding functions. Thus, the structural steel shop and the work performed there is an integral part of Dravo's shipbuilding operations at the complex. Because we feel the Congress was familiar with the assembly-line methods employed in American manufacturing, we hold that the congressional intent underlying the extension of the LHWCA is best effectuated by extending coverage to the labor force in such a building once the "functional relationship" test of Johns has been met.
 
 
 34
 The petition for review will be denied and the order of the Benefits Review Board will be affirmed.
 
 
 
 [1]
 Act of October 27, 1972, Pub.L. No. 92-576, 86 Stat. 1251 (codified in scattered sections of 33 U.S.C. § 901-49) (Supp. IV, 1974)
 
 
 [2]
 At page 636 of the Johns opinion, Judge Gibbons concluded:
 ". . . it should be within Congress' legislative jurisdiction under Article III, Section 2 to provide a remedy for persons injured in the course of maritime employment, irrespective of the place of injury. It is the existence of the special employer-employee relationship, and not the situs of that relationship, that is significant for purposes of admiralty jurisdiction."
 At page 638 Judge Gibbons stated:
 "Congress . . . intended to expand the scope of the LHWCA to provide a federal workmen's compensation remedy for all maritime employees. We believe that Congress has exercised in full its legislative jurisdiction in admiralty. As long as the employment nexus (status) with maritime activity is maintained, the federal compensation remedy should be available. Resuscitating the situs requirement in cases satisfying the status test will interfere with Congress' intention to eliminate the phenomenon of shifting coverage."
 See page 633 and note 3 below.
 
 
 [3]
 Changes made by the 1972 Amendments to the earlier Act which are pertinent to this opinion have recently been extensively reviewed by this Circuit. See Johns, supra at 632-634
 
 
 [4]
 In The Genesee Chief, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1852), the Court sustained an 1845 act of Congress which extended the federal admiralty jurisdiction to inland waterways, thereby overruling The Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1852), which had held that the jurisdiction was limited by the English determinant, "within the ebb and flow of the tide." Since then Congress has on a number of other occasions not only altered the substantive rules of maritime law, but enlarged the classes of cases which fall within the jurisdiction itself
 For instance, originally, the position that admiralty jurisdiction over torts depended on the place where the wrong was consummated was regarded as too fundamental for argument. The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866). When Congress, however, extended the jurisdiction to damage to shore structures caused by vessels for the limited purpose of limitation of liability proceedings, Act of June 26, 1884, c. 121, § 18, 23 Stat. 57, 46 U.S.C. § 189, the Supreme Court refused to construe the statutory provision narrowly in order to limit it to the previously recognized scope of the jurisdiction. Richardson v. Harmon, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110 (1911). Finally, in 1948, Congress extended the jurisdiction to all injuries on land caused by vessels, for all purposes. Admiralty Extension Act, 62 Stat. 496 (1948), 46 U.S.C. § 740. This general extension of the jurisdiction to torts previously considered in American law to be non-maritime was upheld as well. United States v. Matson Navigation Co., 201 F.2d 610 (9th Cir. 1953), cited with apparent approval in Victory Carriers, Inc. v. Law, 404 U.S. 202, 209 n.9, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).
 Congress in 1910 brought within the cognizance of admiralty jurisdiction, by allowing a lien in rem, contracts for repairs or supplies furnished a vessel in her home port, Act of June 23, 1910, c. 373, 36 Stat. 604, as amended, 46 U.S.C. §§ 971-75 (the Federal Maritime Lien Act), one of the classes of contracts whose exclusion from the jurisdiction had been relied upon in People's Ferry Co. v. Beers, 61 U.S. (20 How.) 393, 15 L.Ed. 961 (1857); and its power to do so was sustained. E. g., Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920); United States v. Carver, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361 (1923). Further, in 1920, Congress extended the jurisdiction to ship mortgages generally, Act of June 5, 1920, c. 250, § 30, 41 Stat. 988, 1000, as amended, 46 U.S.C. § 911 et seq., notwithstanding that they had previously been declared non-maritime contracts by the Supreme Court, Bogart v. The John Jay, 58 U.S. (17 How.) 399, 15 L.Ed. 95 (1854); and the extension was sustained in Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934). There are, of course, limits "the concept of the admiralty and maritime jurisdiction," or "a proper conception of maritime concerns." But the previous restrictive decisions so strongly influenced by the narrow restraints placed on the Admiralty in England provide little guidance as to the scope of the concept. Rather, the broader view of what is "maritime" in the "general maritime law" provides the basis for analysis of what may properly be so designated within the constitutional grant. See also, e. g., United States v. Webb, Inc., 397 U.S. 179, 191, 90 S.Ct. 850, 25 L.Ed.2d 207 (1968); Panama Railroad Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 68 L.Ed. 748 (1924); The Lottawanna, 88 U.S. (21 Wall.) 559, 576, 22 L.Ed. 654 (1875).
 
 
 [5]
 Our conclusion in this case finds further support from an analysis of the legislative history of the 1972 Amendments. The extended coverage afforded by the 1972 Amendments was the result of compromise between competing interests which substantially raised the workmen's compensation benefits payable under the Act and as a trade-off to the employers, overruled the Sieracki-Ryan liability. See Johns, supra at 636; Griffith v. Wheeling Pittsburgh Steel Corporation, 521 F.2d 31, 38-40 (3d Cir. 1975); see also Comment, Negligence Standards Under the 1972 Amendments to the Harbor Workers' and Longshoremen's Compensation Act: Examining the Viewpoints, 21 Vill.L.Rev. 244, note 17, 246 (1976). Shipbuilders and shipbuilding employees, as well as longshoremen and stevedores, were parties to the compromise. See, e. g., Hearings on S. 2318, S. 525, S. 1547 Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 92d Cong., 2d Sess. (1972), at 174-77 & 820-21
 
 
 [6]
 See G. Gilmore & C. Black, The Law of Admiralty, §§ 6-48, 6-49 (2d ed. 1975)
 
 
 [7]
 On this appeal, the Director, Office of Workers' Compensation Programs, United States Department of Labor, has argued at some length that we should defer to the BRB's determination of the employees and areas within the extended coverage of the LHWCA. See Director's brief at 29-34. Among other suggestions made by the Director is his contention that 33 U.S.C. § 920(a) creates a "statutory presumption 'that the claim comes within the provisions of this Act.' " Brief at 31. Because the record makes clear that the claimant was a § 2(a), 33 U.S.C. § 902(3), as amended, "employee," we have no need to decide these contentions at this time, except to note that several other circuit court panels have reached these issues with mixed results. See, e. g., Stockman v. John T. Clark & Son of Boston, Inc., Opinion of July 27, 1976, 539 F.2d 264, at 269-70 (1st Cir.); Pittston Stevedoring Corp. v. Dellaventura, Opinion of July 1, 1976, 544 F.2d 35, at 46-51 (2d Cir.), but see Perdue, supra at 540-542. In cases based on claims arising before the effective date of P.L. 92-576, the presumption created by 33 U.S.C. § 920(a) was held to limit judicial review of determinations that injuries arose out of the employment. See, e. g., Continental Insurance Co. v. Byrne, 471 F.2d 257 (7th Cir. 1972); cf. Overseas African Construction Corp. v. McMullen, 500 F.2d 1291 (2d Cir. 1974); Motteler v. J. A. Jones Construction Co., 457 F.2d 917 (7th Cir. 1972)
 
 
 [8]
 We find reinforcement for this conclusion in the recent Perdue opinion of the Fifth Circuit, where that court affirmed a BRB determination of LHWCA coverage of claimant Nulty in circumstances substantially similar to those in this case. See Perdue, supra at 543
 
 
 [9]
 We note that the situs of the injury in Johns was a public street. Although the panel in that case remanded for further fact findings, it was clear that the panel felt the "situs" might be a proper one under 33 U.S.C. § 903(a), as amended
 
 
 [10]
 The next four sentences of the Johns opinion are quoted above at note 2